

**SO ORDERED,**

**Judge Jason D. Woodard**

**United States Bankruptcy Judge**

**The Order of the Court is set forth below. The case docket reflects the date entered.**

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF MISSISSIPPI

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| MICHAEL SHELTON SMITH, | ) | Case No.:  15-13625-JDW |
| | ) | |
| Debtor. | ) | Chapter    7 |

| | | |
|---|---|---|
| BOBBIE CHANCE ROBINSON | ) | |
| & COMMERCIAL GRAIN | ) | |
| MARKETING, LLC, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | A.P. No.:  16-01033-JDW |
| | ) | |
| MICHAEL SHELTON SMITH, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION[1]

---

[1] This Memorandum Opinion constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to adversary proceedings in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent any finding of fact is construed to be a conclusion of law, or vice versa, it is adopted as such.

This adversary proceeding came before the Court for trial on February 27, 2018, on the Complaint (A.P. Dkt. # 1)[2] filed by creditor/plaintiffs Bobbie Chance Robinson and Commercial Grain Marketing, LLC ("CGM", and together with Mr. Robinson, the "Plaintiffs") against debtor/defendant Michael Shelton Smith (the "Debtor"), alleging that certain debts owed to each of the plaintiffs is nondischargeable under 11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6), and alleging that the Debtor should be denied his general discharge under 11 U.S.C. § 727(a)(5).[3]   Glenn Williams represented Mr. Robinson and CGM at trial, and John Sherman represented the Debtor.  The Court admitted documents into evidence and heard testimony from the Debtor, Mr. Robinson, Joe "Pete" Willingham, Stephen Stimson, and expert witness Daniel V. Risner.  At the conclusion of the trial, the Court took the matter under advisement.

The parties agree that the Debtor was primarily responsible for the day-to-day bookkeeping and financial management of CGM.  CGM contends that while managing CGM's finances, the Debtor misappropriated CGM's funds for the benefit of other companies in which he and/or his family members held an interest.  In addition, Mr. Robinson alleges that two loans

---

[2] Citations to the docket in the main bankruptcy case are to (Bankr. Dkt. # ); citations to the docket in the adversary proceeding are to (A.P. Dkt. # ).

[3] All statutory references are to Title 11 of the United States Code (the "Bankruptcy Code"), unless otherwise indicated.

he made to CGM—one for $900,000 in April 2014 and another for $311,000 in January 2015—were made based on the Debtor's fraudulent misrepresentations. Neither loan has been repaid. Although Mr. Robinson made the loans to CGM and not to the Debtor individually, Mr. Robinson alleges that the loans were made to CGM at the Debtor's request, based on the Debtor's fraudulent misrepresentations.

For the reasons set forth below, the Court finds that Mr. Robinson and CGM are each entitled to nondischargeable judgments against the Debtor (although in amounts less than sought by the Plaintiffs), but that the Debtor is entitled to his general chapter 7 discharge under § 727.

## I.   <u>JURISDICTION</u>

This Court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157(a) and 1334(b), and the United States District Court for the Northern District of Mississippi's *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc Dated August 6, 1984*. This is a core proceeding arising under Title 11 of the United States Code as defined in 28 U.S.C. § 157(b)(2)(I), (J) and (O).

## II.   <u>PROCEDURAL HISTORY</u>

The Debtor filed his voluntary chapter 7 bankruptcy petition on October 11, 2015 (Bankr. Dkt. # 1). The Plaintiffs filed the complaint against the Debtor on March 18, 2016 (the "Complaint")(A.P. Dkt. # 1). The

Complaint contains four counts.  In Count I, Mr. Robinson alleges that a debt owed to him by the Debtor should be excepted from discharge under § 523(a)(2)(A).  In Counts II and III, both Plaintiffs allege that debts owed to them by the Debtor are nondischargeable under §§ 523(a)(4) and 523(a)(6).  Finally, in Count IV, the Plaintiffs allege that the Debtor's general chapter 7 discharge should be denied under § 727(a)(5).

In June 2017, the Debtor filed a motion for summary judgment, in which he alleged both that CGM lacked corporate authority to file the Complaint and that he did not owe any debt, individually, to either CGM or Mr. Robinson (A.P. Dkt. # 40).  In denying the motion, the Court held that the subsequent ratification of the filing of the Complaint by a majority of CGM's members was effective and that material facts remained at issue as to the Debtor's individual liability to both Plaintiffs (A.P. Dkt. # 59).

### III.    FINDINGS OF FACT

The Debtor formerly worked for his parents' company, Delta Rice Services ("Delta Rice").  Delta Rice at one time operated the largest grain storage facility in the southeastern United States.  It consisted of 72 bins with a storage capacity of 3.8 million bushels, located on over 20 acres of land (the "Facilities").  In November 2012, the Debtor's parents closed Delta Rice, leaving him unemployed.  In December 2012, the Debtor and Joe "Pete" Willingham, also a former employee of Delta Rice, formed CGM

Transportation, a trucking company ("Transportation").   In January 2013, the Debtor, Mr. Willingham, and Jim Daven formed CGM, which was in the business of purchasing, storing, and drying grain received from local farmers. Each member served a specific role for CGM:   the Debtor handled the finances, Mr. Willingham oversaw the grain operations, and Mr. Daven handled sales.   Mr. Robinson had known the Debtor all their adult lives, and over a friendly card game at Mr. Willingham's shop, Mr. Robinson agreed to join the already-formed CGM as a member.   Mr. Robinson was asked to join CGM to be a source of capital.   Prior to the loans in question, Mr. Robinson loaned interest-free money to CGM on several occasions and was paid back as promised.

CGM leased the Facilities from Delta Rice to store and dry the grain. The lease payments were calculated at 4 cents per bushel stored in the Facility per month, prorated on a daily basis.   CGM then contracted with Transportation to deliver the grain to an end user or exporter.   There was no official relationship between CGM and CGM Transportation, but there was a verbal agreement that Transportation be given the first opportunity to transport the grain.   CGM was usually paid from the farmer's settlement once the grain was finally delivered to the end user or exporter.   The end user paid CGM, who then paid the farmer for the grain and Transportation for its services transporting the grain from the Facilities to the end user (farmers

paid their own freight to deliver the grain to the Facilities).  CGM's goal was to make a profit of 20 cents per bushel.

The Debtor kept the daily books for CGM.  He paid the bills, wrote the settlement checks to the farmers, calculated what was owed to the farmers and what was to be deducted for CGM's charges, and kept the records on a computer and in files.  During the same time period, he also kept the books for Transportation.  The Debtor generated invoices for both rent owed to Delta Rice and for amounts owed to Transportation, all to be paid by CGM. CGM was never to bear the cost of the freight, either to or from the Facilities.

### A. Scott Petroleum

CGM owned 4 vehicles.  Only one used diesel fuel, a pickup truck driven by the Debtor, which he testified held 26 gallons of fuel.  From the evidence admitted at trial, it is clear that the Debtor routinely charged diesel fuel for vehicles not owned or used by CGM to CGM's account with Scott Petroleum.   The Court received into evidence a copy of a $41,792.27 check drawn on CGM's account, payable to Scott Petroleum, dated March 4, 2015. The Debtor testified that this payment was probably for propane, which CGM used in its dryers, but the backup documents tell a different story.  Fuel records indicate regular purchases of diesel fuel in excess of 26 gallons for the time period of March 1, 2013 through October 20, 2015 on CGM's account. These amounts should have been charged to and paid by Transportation, not

CGM.  It is clear that from the March 4, 2015, check and the Scott Petroleum ledger that the Debtor used CGM funds to pay Transportation's fuel costs. The Court is unable to ascertain from the evidence submitted, though, exactly which transactions the $41,792.27 payment covered, and, accordingly, is likewise unable to ascertain the exact amount of the CGM funds the Debtor misappropriated to pay Transportation's diesel fuel expenses.  The account history contains 71 pages of line items detailing fuel charges and propane charges.  The payment is simply deducted from the running total, and it is not used to pay any one invoice.  There is no way to tell, and there is no evidence, of whether this particular check paid fuel charges, propane charges, or some of each.

## B. Freight Charges

The parties agree that CGM should never have been the party ultimately paying freight charges due to Transportation.  If CGM paid freight to Transportation, CGM was entitled to reimbursement for those charges upon receiving the settlement from the end user/exporter.  Instead, in some instances, Transportation received payment up front from CGM, and then again from the settlement proceeds.  Over the time period of May 5, 2014 through October 28, 2015, the overpayments totaled $107,318.42.[4]  The Debtor was the bookkeeper for both Transportation and CGM, so in making

---

[4] There were other instances of double payment to Transportation, but those were repaid.

these overpayments, he diverted funds from CGM to another company owned partially by the Debtor and not either Plaintiff.

### C. Rent Overpayment

CGM leased the Facilities from Delta Rice. In April 2015, at Delta Rice's request, CGM paid $45,000 in advance rent so that Delta Rice could pay its property taxes. Most of this was later credited for subsequent rent payments, but $8,357.84 remains uncredited, as shown on the rental invoices. Accordingly, the Debtor caused CGM to overpay Delta Rice, his father's company, $8,357.84. This amount was never repaid or credited back to CGM by the Debtor, Delta Rice, or otherwise.

### D. The $900,000 Loan

In April 2014, the Debtor approached Mr. Robinson and asked him to advance $837,000 to CGM. The Debtor told Mr. Robinson that CGM urgently needed the money to pay a farmer, Mr. Flautt, for his corn that had been delivered to the Facilities. The Debtor represented to Mr. Robinson that he would be repaid from an outstanding payment CGM expected to receive from PECO or Lansing for 200,000 bushels of corn. In reliance on the Debtor's representations that the money was urgently needed to pay Mr. Flautt, and that there was a specific source of repayment for the loan, Mr. Robinson deposited $900,000 into CGM's account on April 17, 2014. Mr. Robinson

loaned these funds to pay the $837,000 to Mr. Flautt, with $63,000 extra to cover additional operating expenses.

In reality, in April 2014 when the Debtor solicited the loan from Mr. Robinson, there were no payments outstanding from PECO or Lansing for 200,000 bushels of corn or otherwise.  The 200,000 bushels of corn were two separate contracts with PECO, and had been paid in September and October 2013, well before the Debtor even requested the loan he told Mr. Robinson this receivable would repay.  The Debtor testified that he was unaware that CGM had already been paid the PECO receivables.  Not only had CGM already been paid the PECO receivables well before Mr. Robinson made the $900,000 loan for whose repayment the Debtor promised those receivables, CGM had also already received the settlement from the end user/exporter on Mr. Flautt's corn and Mr. Flautt had also already been paid. It is not credible that the Debtor, the person managing the day-to-day business of CGM, would be unaware of having already received payment of approximately $1 million. It is also not credible that he would be unaware that Mr. Flautt had already been paid.  Accordingly, the Debtor's representations regarding the purpose for the loan and the source of repayment for that loan were both false at the time he made them, and he knew they were false when he made those representations.

After a month, Mr. Robinson started inquiring as to when the PECO payment would be received.  The Debtor then told him he might have made a mistake.  Further investigation revealed that CGM had already received the PECO payment.

### E. The $311,000 Loan

In January 2015, the Debtor sought a second loan from Mr. Robinson, this time in the amount of $311,000.  The Debtor represented that this sum was needed to pay Scotty Melton and Melton Farms for rice that Melton had already delivered to CGM that was ready to be shipped.  The Debtor told Mr. Robinson that the rice could not be shipped, because CGM was waiting on barges to become available.  The Debtor told Mr. Robinson that he would be repaid the $311,000 when the rice was shipped and CGM received the settlement proceeds from the exporter, KBX.  Mr. Robinson testified that he was concerned about lending an additional $311,000 when he was still owed $900,000, but he knew that Melton needed to be paid and he was trying to keep CGM operating so that he could recoup all that he was owed and provide needed services to local farmers.  Before Mr. Robinson made the $311,000 loan, he called other operators to verify the Debtor's representations about the lack of availability of barges.  These third parties verified that barges were unavailable because of the river levels.  Mr. Robinson also tried to call KBX, but its representative would not give him any information

because his name was not on the contracts.  The Debtor showed Mr. Robinson the Melton invoice to prove the need for the loan.  Because Mr. Robinson understood that Melton needed to be paid, and that he would be repaid as soon as the settlement money came in once barges were available and the rice shipped, Mr. Robinson loaned CGM the additional $311,000.

In fact, Melton had already been paid $311,000 for the rice in the middle of December 2014—a month before the Debtor solicited this loan and made the representations.  The KBX payment was received by CGM in April or May 2015, but although those funds were earmarked to repay Mr. Robinson, the Debtor did not do so.  Instead, he paid other operating costs, including amounts owed to Delta Rice (his father's company), salaries (including his own), and amounts due to Transportation (his company).

## I.   <u>CONCLUSIONS OF LAW</u>

Section 523 outlines the exceptions to discharge in bankruptcy proceedings.  The creditor bears the burden of proving by a preponderance of the evidence that the debt in question should be excepted from discharge. *Grogan v. Garner*, 498 U.S. 279, 286 (1991).  Exceptions to discharge are to be narrowly construed in favor of the debtor in order to effectuate the fresh start policy of the Bankruptcy Code.  *Miller v. Abrams (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998).

## A. Debtor's Personal Liability

The Debtor argues that because the loans made by Mr. Robinson were to CGM, and not to him individually, the Debtor does not personally owe a debt to either CGM or Mr. Robinson. This argument ignores the Plaintiffs' allegations of individual financial misconduct and fraud on the part of the Debtor. An officer or employee who misappropriates company property or otherwise embezzles or steals from a company (or from another individual) is personally liable for the damages caused by his misappropriation. *Int'l Order of Twelve, Knights & Daughters of Tabor v. Marshall,* 195 So.2d 66 (Miss. 1967). Furthermore, an individual is liable for damages caused by his own tortious conduct. *Wheeler v. Frito–Lay, Inc.,* 743 F.Supp. 483, 487 (S.D. Miss. 1990). An LLC member cannot hide behind corporate form to escape liability for damages caused by his tortious conduct, individually or as a fiduciary. *See, e.g., U.S. v. Bestfoods*, 524 U.S. 51, 62 (1998).

In contemplating whether the Debtor can be liable to Mr. Robinson for the two loans to CGM, the Court turns to precedent from the Fifth Circuit Court of Appeals, which has addressed this precise situation, applying Mississippi state law:

> In circumstances where a defendant acts as an agent for a known principal, the general rule in Mississippi law is that the defendant-agent incurs no liability for a principal's breach of duty. *See Moore v. Interstate Fire Insurance Company,* 717 F.Supp. 1193 (S.D.Miss.1989); *Schoonover v. West American Ins.*

*Co.,* 665 F.Supp. 511 (S.D.Miss.1987) (interpreting Mississippi law). On the other hand, an agent for a disclosed principal can be held personally liable for his own tortious acts committed within the scope of his employment. *Wheeler v. Frito–Lay, Inc.,* 743 F.Supp. 483, 487 (S.D.Miss.1990) (holding that plaintiff had stated a possible claim against employee-driver for negligent driving within the scope of employment). The agent is subject to personal liability when he "directly participates in or authorizes the commission of a tort," *Id.* (quoting *Mississippi Printing Co., Inc. v. Maris, West & Baker, Inc.,* 492 So.2d 977, 978 (Miss.1986)), but individual liability may not be predicated merely on his connection to the corporation but must have as its foundation "individual wrongdoing." *Turner v. Wilson,* 620 So.2d 545, 548 (Miss.1993). "The thrust of the general rule is that the officer [or agent] to be held personally liable must have some direct, personal participation in the tort, as where the defendant was the 'guiding spirit' behind the wrongful conduct ... or the 'central figure' in the challenged corporate activity." *Mozingo v. Correct Mfg. Corp.,* 752 F.2d 168, 173 (5th Cir.1985) (quotations omitted).

*Hart v. Bayer Corp.,* 199 F.3d 239, 247 (5th Cir. 2000). Accordingly, if the Court concludes that the Debtor committed fraud in soliciting the loans made by Mr. Robinson to CGM, then the Debtor can be personally liable for the damages resulting to Mr. Robinson from the Debtor's fraudulent misrepresentations. Likewise, to the extent that the Court concludes CGM has been damaged by the Debtor's misconduct, breach of fiduciary duty, or misappropriation of funds, then the Debtor will be personally liable to CGM for those damages.

## B. Dischargeability under 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this
> title does not discharge an individual debtor from any debt—
> . . .
> (2) for money, property, services, or an extension, renewal, or
> refinancing of credit, to the extent obtained by—
>> (A) false pretenses, a false representation, or actual fraud, other
>> than a statement respecting the debtor's or an insider's financial
>> condition;

11 U.S.C. § 523(a)(2)(A). The United States Supreme Court has distinguished between "false pretenses and representations" and "actual fraud," and recognized two distinct paths for nondischargeability under 523(a)(2)(A). *Husky Intern. Electronics, Inc. v. Ritz*, --- U.S. ---; 136 S. Ct. 1581, 1586 (2016). Satisfaction of the elements of either path is sufficient.

## 1. False Pretenses and Representations

In order for a debt to be nondischargeable based on false pretenses and false representations, the objecting creditor must prove by a preponderance of the evidence that the debtor's representation was: (1) a knowing and fraudulent falsehood[5] (2) describing past or current facts (3) that was relied on by the other party. *Allison v. Roberts (In re Allison)*, 960 F.2d 481, 483 (5th Cir. 1992). The creditor's reliance need not be objectively reasonable, just subjectively justifiable. *Field v. Mans*, 516 U.S. 59, 76 (1995).

---

[5] The United States Supreme Court recently re-confirmed the distinction between false representations and pretenses from actual fraud under §523(a)(2)(A). *Husky Intern. Electronics, Inc. v. Ritz*, 136 S.Ct. 1581 (2016) ("Congress did not intend 'actual fraud' to mean the same thing as a 'false representation' . . . . ").

14

The first element requires that the debtor have made a false representation or that his words or actions constituted false pretenses; the second element requires that such representation be regarding past or present facts. *Allison*, 960 F.2d at 483.

With regard to the $900,000 loan, the Debtor lied to Mr. Robinson to induce him to make the loan. The Debtor told Mr. Robinson that CGM presently needed $837,000 to pay Mr. Flautt. The evidence shows, however, that Mr. Flautt had already been paid when the loan was solicited by the Debtor. In addition, the Debtor told Mr. Robinson that CGM had a current receivable from PECO/Lansing for 200,000 bushels of corn, when, in fact, that receivable had already been paid. These two representations, from the Debtor to Mr. Robinson, were false at the time the Debtor made them. The Court further finds that the Debtor knew they were false at the time. The Debtor knew that Mr. Flautt had already been paid, because he was the one who paid him. Furthermore, as set forth above, the Court does not believe that the Debtor did not know that CGM had already received the payment from PECO/Lansing. Thus, the first and second elements are satisfied, to the extent of the $837,000 that the Debtor actually requested from Mr. Robinson.[6]

---

[6] The additional $63,000 that Mr. Robinson deposited was not solicited by the Debtor and was used as intended – for operating expenses. Accordingly, this amount of this loan is dischargeable as to Mr. Robinson.

With regard to the $311,000 loan, the Debtor again lied to Mr. Robinson to induce him to make the loan.  In January 2015, the Debtor told Mr. Robinson that CGM presently needed $311,000 to pay Scotty Melton/Melton Farms.  The evidence shows, however, that in December 2014, before the Debtor even spoke with Mr. Robinson about this loan, Melton had already been paid in full and the Debtor knew it.  Thus, the first and second elements are satisfied with regard to this $311,000 debt.

As to the third element, Mr. Robinson credibly testified that he relied on the Debtor's representations in deciding to lend the $900,000 and then the $311,000 to CGM.  Again, Mr. Robinson wanted to ensure that the farmers were getting paid so that CGM could keep continue operations.  Mr. Robinson relied on the Debtor's statements in making the $900,000 loan, and, given the parties' history of lending and repayment, his reliance on the Debtor's statements was subjectively justifiable.  *Field v. Mans*, 516 U.S. at 76 (reliance standard is subjective justification, not objective reasonableness).  Mr. Robinson had relied on the Debtor's representations before, and he had always been repaid.

With regard to the $311,000 loan, it is important to note that Mr. Robinson did additional due diligence to corroborate the Debtor's story regarding the method for the repayment of these funds.  Satisfied that the Debtor was telling the truth regarding the lack of availability of barges, Mr.

Robinson relied on the Debtor's statement of need to provide funds the Debtor insisted were necessary to pay Melton.  His reliance on the Debtor's statements with regard to the $311,000 loan was also subjectively justifiable, especially since he asked for and received additional evidence that bolstered those statements. *See Field*, 516 U.S. at 76.

The Debtor is subject to personal liability in this instance because he twice committed the tort – fraud – through which the debts were incurred and by which Mr. Robinson was harmed. *Mississippi Printing Co., Inc. v. Maris, West & Baker, Inc.,* 492 So.2d 977, 978 (Miss.1986) (a disclosed agent is personally liable when he "directly participates in or authorizes the commission of a tort"). Accordingly, the Debtor is personally liable to Mr. Robinson for both the $837,000 and $311,000 Mr. Robinson loaned to CGM, and these debts are nondischargeable as to the Debtor under the "false pretenses and representations" prong of § 523(a)(2)(A).

## 2. Actual Fraud

The Fifth Circuit previously set out the elements for actual fraud nondischargeability, which included the requirement of a representation by the debtor. *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292-93 (5th Cir. 1995).   In 2016, the United States Supreme Court concluded otherwise, holding that a representation by the debtor is not required. *Ritz*, 136 S. Ct. at 1586 ("The term 'actual fraud' in § 523(a)(2)(A) encompasses forms of

fraud, like fraudulent conveyances schemes, that can be effected without a false representation."). In order to establish that a debt is excepted from discharge based on actual fraud, the objecting party must prove: (1) the debtor committed actual fraud; (2) the debtor obtained money, property, services, or credit by the actual fraud; and (3) the debt arises from the actual fraud. *Id.* at 1587-88.

First, the debtor must have committed actual fraud. *Id.* There are two parts to actual fraud: actual and fraud. *Id.* at 1586. For fraud to be "actual," there must be wrongful intent. *Id.* A debtor's subjective intent may be inferred by examining the totality of the circumstances because it most commonly cannot be established by direct evidence. *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287-88 (8th Cir. 1987) (abrogated on other grounds); *Webster City Prod. Credit Ass'n v. Simpson (In re Simpson)*, 29 B.R. 202, 211-12 (Bankr. N.D. Iowa 1983); *Mick v. Hosking (In re Hosking)*, 19 B.R. 891, 895 (Bankr. W.D. Wis. 1982); *Sun Bank and Trust Co. v. Rickey (In re Rickey)*, 8 B.R. 860, 863 (Bankr. M.D. Fla 1981).

Fraud, as used in § 523(a)(2)(A), "connotes deception or trickery." *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 11 (B.A.P. 10th Cir. 2016) (citing *Ritz*, 136 S.Ct. at 1586). In *Ritz*, the Supreme Court declined to adopt a definition of fraud because of the multiplicity of situations in which it

may be present. *Ritz*, 136 S. Ct. at 1586-87. The Seventh Circuit Court of

Appeals previously expounded:

> Fraud is a generic term, which embraces all the multifarious means
> which human ingenuity can devise . . . . No definite and invariable rule
> can be laid down as a general proposition defining fraud, and it
> includes all surprise, trick, cunning, dissembling, and any unfair way
> by which another is cheated.

*McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000). In this instance, as

set forth above, the Debtor told outright lies to Mr. Robinson in order to

obtain the funds from Mr. Robinson. Accordingly, the first element is met as

to both loans.

The second element is that the debtor obtained money, property

services, or credit by the actual fraud. *Ritz*, 136 S. Ct. at 1587-88. "The most

straightforward reading of § 523(a)(2)(A) is that it prevents discharge of 'any

debt' respecting money, property, services, or . . . credit' that the debtor has

fraudulently obtained . . . ." *Cohen v. de la Cruz*, 523 U.S. 213, 218 (1998).

"[T]he phrase 'to the extent obtained by' in § 523(a)(2)(A) . . . does not impose

any limitation on the extent to which 'any debt' arising from fraud is excepted

from discharge." *Id.* In this instance, the Debtor is liable for amounts he

obtained fraudulently on behalf of CGM, as the debts were procured by his

fraud. *Hart*, 199 F.3d at 247. Accordingly, the second element is also met as

to both loans.

The third element requires that the debt arise from the actual fraud. *Cohen*, 523 U.S. at 218. "Once it is established that specific money or property has been obtained by fraud . . . 'any debt' arising therefrom is excepted from discharge." *Id.* at 218; s*ee also Ritz*, 136 S. Ct. at 1589 ("any debts 'traceable to' the fraudulent conveyance will be nondischargeable under § 523(a)(2)(A)."). The debts for both loans clearly arose from the Debtor's fraud, as neither loan would have been made but for his misrepresentations.

Accordingly, the debts for both loans ($837,000 and $311,000) are also nondischargeable as to the Debtor under the "actual fraud" prong of § 523(a)(2)(A). Because the Court has concluded that the debts owed to Mr. Robinson by the Debtor for the loans are nondischargeable under either prong of § 523(a)(2)(A), there is no need for the Court to examine these debts under §523(a)(4) or (a)(6); however the Court will address CGM's allegations that certain amounts owed to it by the Debtor are nondischargeable.

## C. Dischargeability under § 523(a)(4)

CGM asserts that its claims are nondischargeable pursuant to §523(a)(4), which provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt
> . . . .
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

11 U.S.C. § 523(a)(4).

20

The phrase "debt for" means "debt arising from" or "debt on account of." *Cohen*, 523 U.S. at 220-21. There are three separate types of debts rendered nondischargeable under §523(a)(4): (1) debts resulting from fraud or defalcation while acting in a fiduciary capacity; (2) debts resulting from embezzlement; and (3) debts resulting from larceny. *Humphries v. Rogers (In re Humphries)*, 516 B.R. 856, 866 (Bankr. N.D. Miss. 2014).

Accordingly, the first step is determining whether there is in fact a "debt" owed to the objecting creditor, CGM. CGM bears the burden of proving the existence of the debt, in addition to the other elements of nondischargeability. *Grogan v. Garner*, 498 U.S. at 286. Because CGM did not prove the amount of the payments that the Debtor caused CGM to make to Scott Petroleum for Transportation's diesel fuel expenses, there is no nondischargeable debt arising from the payments to Scott Petroleum. On the other hand, the Court found, above, that the Debtor owes CGM $107,318.42 for freight overpayments to Transportation and $8,357.84 for rent overpayments he paid to Delta Rice, and it is the dischargeability of those two debts under § 523(a)(4) that the Court will now address.

Determining whether a debtor committed fraud or defalcation while acting in a fiduciary capacity is a two-step process. *Int'l Beauty Products v. Beveridge (In re Beveridge)*, 416 B.R. 552, 570 (Bankr. N.D. Tex. 2009) (citing *Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998)).

First, it must be shown that the requisite fiduciary relationship existed prior to the particular transaction from which the debt arose. *See, e.g., Murphy & Robinson Inv. Co. v. Cross (In re Cross)*, 666 F.2d 873, 879 (5th Cir. Unit B 1982); *Wright v. Menendez (In re Menendez)*, 107 B.R. 789, 793 (Bankr. S.D. Fla 1989); *Victor v. Valdes (In re Valdes)*, 98 B.R. 78, 80 (Bankr. M.D. Fla. 1989). Second, some type of fraud or defalcation must have occurred during the fiduciary relationship. *In re Chavez*, 140 B.R. 413, 422 (Bankr. W.D. Tex. 1992).

To determine whether a debtor was acting in a fiduciary capacity under § 523(a)(4), the Court must look to federal law. *Miller*, 156 F.3d at 602. The definition of "fiduciary" for purposes of section 523(a)(4) is narrower than under common law, as it is "limited to instances involving express or technical trusts. The trustee's duties must . . . arise independent of any contractual obligation." *Shcolnik v. Rapid Settlements, Ltd. (In re Shcolnik)*, 670 F.3d 624, 628 (5th Cir. 2012). Such a trust must exist prior to the alleged wrongful acts and without reference to those acts. *Rain Bird Corp. v. Salisbury (In re Salisbury)* 331 B.R. 682, 692 (Bankr. N.D. Miss. 2005) (citing *Davis v. Aetna Accept. Co.*, 293 U.S. 328, 333 (1934)).

Accordingly, this Court must determine whether or not a preexisting express or technical trust, of the kind contemplated by §523(a)(4), existed between the parties so as to place the Debtor in a fiduciary capacity as to

CGM, independent of the transactions giving rise to the debts complained about herein.    Courts have found nondischargeable "debts arising from misappropriation by persons serving in a traditional, pre-existing fiduciary capacity, as understood by state law principles" (e.g., bank officers, executors, guardians, receivers), and where the debtor was an officer of the creditor and did not deny that he was a fiduciary.    *Shcolnik*, 670 F.3d at 628.    In this instance, the Debtor is a member of CGM and also served as its day-to-day manager and bookkeeper.    He served in a fiduciary capacity to CGM.    *See, e.g., Derouen v. Murray,* 604 So.2d 1086 (Miss. 1992) (holding that a company's officers and directors have a duty of loyalty, good faith, and fair dealing).

The United States Supreme Court has recently addressed the bankruptcy-related definition of "defalcation," holding that defalcation may include both intentional wrongs and wrongdoing that is the result of an actor's conscious disregard (or willful blindness) of a "substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty." *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273-74 (2013) (internal citations omitted).    In this case, the Debtor's misappropriation of CGM's funds was clearly intentional.    The Debtor breached his fiduciary duty and committed fraud and defalcation by using CGM's funds to overpay companies in which he and/or his family members had an interest (Transportation and

Delta Rice).   Accordingly, the $115,676.26 the Debtor owes to CGM for the freight and rent overpayments are debts resulting from the Debtor's fraud or defalcation while acting in a fiduciary capacity to CGM and are thus excepted from the Debtor's discharge under that prong of § 523(a)(4).   Because the Court concludes these debts are nondischargeable under that subsection, it is unnecessary to address any other bases alleged for the nondischargeability of those debts.

### D. Denial of Discharge under 11 U.S.C. § 727(a)(5)

Finally, the Plaintiffs seek a denial of the Debtor's general chapter 7 discharge under § 727(a)(5).   This subsection provides that the "court shall grant the debtor a discharge, unless the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities."   11 U.S.C. § 727(a)(5).   The Plaintiffs contend that the Debtor's discharge is due to be denied because of his alleged inability to explain how CGM lost at least 1.2 million dollars in around two years of operation.   CGM is not the debtor in this case.   The Plaintiffs have not met their initial burden of production by identifying any lost assets of the Debtor.   *See, e.g., Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616 (11th Cir. 1984).   Accordingly, the Plaintiffs claim for denial of the Debtor's discharge under § 727(a)(5) fails.

## IV.    <u>CONCLUSION</u>

The Debtor owes Mr. Robinson a total of $1,148,000, which shall be nondischargeable under § 523(a)(2)(A).  In addition, the Debtor owes CGM $107,318.42 for freight overpayments and $8,357.84 for rent overpayments, for a total of $115,676.26.  This amount is nondischargeable under § 523(a)(4).  Finally, the Plaintiffs failed to meet their burden under § 727(a)(5), and the Debtor's general discharge will not be denied under that subsection.  A separate final judgment will be entered in accordance herewith.

##END OF OPINION##